**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| **YONI ORLI PERDOMO** | § | |
| Petitioner, | § | |
| VS. | § | |
| | § | |
| **CITY OF LEAGUE CITY, TEXAS** | § | |
| Respondent, | § | |
| and, | § | |
| **CITY OF LEAGUE CITY POLICE** | § | |
| **DEPARTMENT,** | § | **CIVIL ACTION NO:** |
| Respondent, | § | |
| and, | § | _____ |
| **OFFICER TREVOR RECTOR,** | § | |
| Respondent, | § | |
| and, | § | |
| **OFFICER TANNER SURRAT,** | § | |
| Respondent, | § | |
| | § | |
| **All Jointly and Severally.** | § | |
| | § | |

---

**PETITIONER'S ORIGINAL COMPLAINT**

---

**NOW COMES**, **Yoni Orli Perdomo**, filing this Original Complaint and asserting a legal action against the City of League City, Texas, the City of League City Police Department, Officer Trevor Rector, Officer Tanner Surrat, and Officer Trevor Rector all in their Official Capacities and their Individual Capacities. The Respondents, jointly and severally, infringed upon Petitioner, Mr. Yoni Orli Perdomo's, rights as guaranteed by the Constitution and the laws of the United States of America and the State of Texas.

The Petitioner will respectfully show to this Honorable Court as follows:

## I.  NATURE OF THE CASE

1.  This is a civil action arising under the United States Constitution, particularly under the provisions of the Civil Rights Act, Title 42 of the United States Code § 1983, Title 42 of the

United States Code § 1983, Excessive Force, the Fourth Amendment, the Eighth
Amendment,  the Due Process Clause of the Fifth Amendment and Fourteenth Amendment
to the Constitution of the United States, and under federal law, seeking damages against
Respondents for committing acts, under color of law, with the intent and for the purpose of
depriving Mr. Perdomo, herein "Petitioner" of his rights secured under the Constitution, laws
of the United States, and the State of Texas.

## II.  <u>PARTIES</u>

2.  **Petitioner, YONI ORLI PERDOMO**, is not a citizen of the United States, though he
    currently resides in Harris County, Houston, Texas, United States.

3.  Respondent, the **City of League City, Texas**, is a municipal governmental entity located in
    Galveston County, Texas, and may be served at the League City Attorney's Office and/or
    City Manager's Office at 300 W. Walker Street, League City, Texas, or wherever
    Respondent may be found.

4.  Respondent the **City of League City Police Department** ("**LCPD**"), is a municipal
    governmental entity located in Galveston County, Texas, and may be served at the League
    City Attorney's Office and/or City Manager's Office at 300 W. Walker Street, League City,
    Texas, or wherever Respondent may be found.

5.  Respondent, **Officer Trevor Rector** ("**Respondent Rector**"), Badge/ID # 466788, is
    employed by the LCPD and was acting within the scope of his employment and under color
    of statutes, ordinances, rules and regulations, customs and usage of the City of League City,
    Galveston County, and the State of Texas.  At the time of the incident, Respondent Rector
    assumed his role as a peace officer.  Respondent Rector can be served with process by
    delivering a copy of the summons and complaint at an address to be provided under seal due
    to Respondent's role in law enforcement, at the Respondent's place of employment, or
    wherever the Respondent may be found.

6.  Respondent, **Officer Tanner Surrat** ("**Respondent Surrat**"), Badge/ID #466789, is
    employed by the LCPD and was acting within the scope of his employment and under color
    of statutes, ordinances, rules and regulations, customs and usage of the City of League City,
    Galveston County, and the State of Texas.  At the time of the incident, Respondent Surrat
    assumed his role as a peace officer.  Respondent Surrat can be served with process by

delivering a copy of the summons and complaint at an address to be provided under seal due to Respondent's role in law enforcement, at the Respondent's place of employment, or wherever the Respondent may be found.

7.  Though the Petitioner may refer to Respondents collectively at times, specific factual references are made concerning actions or inactions by specific Respondents throughout this Complaint – these are not global allegations.  As such, this pleading complies with current federal standards.  FED. R. CIV. P. 8.

## III.  JURISDICTION

8.  This action is brought pursuant to the Due Process Clauses of the Fifth and Fourteenth Amendments, the Fourth Amendment, and the Eighth Amendment to the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code § 1983.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343.  This Court also has supplemental jurisdiction to hear the state claims that will be set forth in this complaint.

## IV.  VENUE

9.  Venue is proper in this district under 28 U.S.C. 1391(b) because the acts, events or omissions giving rise to this claim occurred in Galveston County, League, Texas, which falls within the United States Court for the Southern District of Texas, Galveston Division.

## V.  FACTUAL BACKGROUND

10.  Mr. Yoni Orli Perdomo, the Petitioner, is a sub-contractor of general skill who was employed by a general contractor.  One or two days prior to the incident at the center of this matter, the general contractor terminated the Petitioner's employment at the project site, a remodel of a residential home, located at 312 Bay Spring Dr., League City, Texas.  The Petitioner was unable to secure payment for worked performed nor allowed retrieve his trade tools upon his exit from the project site.

11.  On or about May 13th, 2022, at approximately 1:30 p.m., at 312 Bay Spring Dr., League City Texas, the Petitioner, by way of a ride provided by a co-worker, arrived at the project site,

where he found the general contractor and demanded he be paid for work performed and to retrieve his tools which were located inside the residential project site.

12. The homeowner joined general contractor on the homeowner's front porch.

13. The general contractor refused to tender payment to the Petitioner for work performed nor allow the Petitioner to retrieve his trade tools. Then, both the homeowner and the general contractor told the Petitioner that he must leave the property.

14. At approximately 1:50 p.m. the Petitioner then called law enforcement for assistance by dialing 911 on his cell phone.

15. The 911 dispatcher apparently had a difficult time understanding what the Petitioner needed (likely due to his limited ability to effectively communicate in English) so the general contractor took it upon himself to snatch the Petitioner's phone from his hand and took over the call.

16. The Petitioner provides a Police Dispatch Event Report, Event ID: 2022-259374, to show when the initial dispatch call went out (time and date) to the responding officers. (Attachment 1 – _Event Report_). Unfortunately, the Petitioner cannot produce the 911 recorded calls because League City's 911 Dispatch "purged" the recordings, despite them being in-process of an information request from Defense Counsel in that matter. This is substantiated in the criminal trial transcript for the Petitioner's Misdemeanor Trial, in the Galveston County Court at Law, No. 1, Cause No. MD407422 [See page 4 of Transcript] (Attachment 2 – _Court Transcript, Cause No. MD407422_).

17. When the general contractor snatched the Petitioner's phone, the Petitioner's frustration and anger increased. Further, when the driver of the Petitioner's transportation observed the loud confrontation and heard the sirens of the responding officers, he left the area; thereby, leaving the Petitioner without transportation and stranded in a residential neighborhood far from his home.

18. As a result, this left the Petitioner without his pay, without his trade tools, without transportation to leave, and without his phone so that he could try to call a third-party transportation service such as Uber, or someone else to come and get him, so that he could peacefully leave.

19. At approximately 2:00 p.m. the responding officers, Respondent Rector and Respondent Surratt arrived at the scene.  According to the Event Report, the responding officers were disconnected.

20. When the officers arrived, the general contractor and homeowner are standing on the homeowner's front porch and the general contractor states they want to press charges against the Petitioner for verbal assault.  Respondent Rector advises the two men that there is no such cause of action "because it doesn't exist".[1] (Bodycam @ 19:01:28)

   a. Respondent Rector then observes the Petitioner approximately two houses away, on the sidewalk, walking towards him.  The following transpires beginning *Id @ 19.01.43.*:

      - Respondent Rector to Petitioner: "Do you need a ride, Dude?"

      - The Petitioner is not agreeably responsive and walks past Respondent Rector

      - Respondent Rector to Petitioner: "Talk to me. Listen. Listen.  Do you speak English?"

      - Petitioner to Respondent Rector: "I don't fucking speak English! Yo hablo español!"

      - Respondent Rector to Petitioner: "Are you stupid?"

      - Petitioner to Respondent Rector: [It is then that the Petitioner turns around loudly exclaiming], "You call me stupid?"

      - Respondent Rector talking over Petitioner: "Relax, relax!"

      - Petitioner to Respondent Rector: "You fucking relax, bro!"

      - Petitioner walks away, his back to Respondent Rector.

      - Respondent Rector to Petitioner: "I just asked if you needed a ride.  You chill out.  Then get the fuck out of here.  Don't come back!."

      - The Petitioner turns back around

      - Petitioner to Respondent Rector: "You want to go to the jail?"

---

[1] Petitioner presents and submits the officers' body-cam footage for the Honorable Court to view.  This footage is submitted to the Clerk, in person by Counsel for the Petitioner, on a USB Drive, within 3-business days of the acceptance of this Original Complaint. Be advised that the officer does not turn on the audio until marker 19:01:23.

- Respondent Rector to Petitioner: "Don't go back! If you go back, you go to jail!"

- Petitioner then turns his back to Respondent Rector, put his hands behind his back in a submissive position (it is clear that the Petitioner has no weapons in his hands); as the Petitioner turns, he backs up into Respondent Rector.

- As this occurs, Respondent immediately bear-hugs and body-slams the Petitioner into the sidewalk, forehead first, and affixes handcuffs upon the Petitioner. (Upon listening to the footage, one can hear the Petitioner's skull crack/fracture.)

21. As a result of the forehead first, body slam, into the concrete sidewalk, the Petitioner *immediately* goes into convulsions as Respondent Rector states, "You're fucking stupid!" and places handcuffs upon the Petitioner, whose hands are still behind his back. *Id @ 19.02.32.* Respondent Rector exclaims to the Petitioner, "Don't ever bump an officer like that!" Petitioner continues to convulse.  And Respondent Rector states to the Petitioner, "What the hell is wrong with you!?" *Id @ 19.02.42.*

22. Respondent Surrat removes the handcuffs from the Petitioner a few seconds later *Id @ 19.03.04.*

23. Respondent Rector asks the Petitioner to go on to his side.  Then both Respondent Rector and Respondent Surrat move the Petitioner onto his right side.  It is here where it is clear that the Petitioner is injured – there is a visible pool of blood on the sidewalk and on the right side of his face and his breathing is belabored. *Id @ 19.03.38.*

24. Both Respondent Rector and Respondent Surratt then roll the Petitioner on to his back. *Id @ 19.04.10.*  Then pick the Petitioner up and put him into the grass, along the sidewalk. *Id @ 19.04.20.*   It is at this point that one can see that there are multiple abrasions on the Petitioner's right hand and is semi-responsive.

25. Respondent Rector asks the Petitioner if he wants to sit up and attempts to assist the Petitioner to sit up.  Respondent Rector then tells the Petitioner that he should just stay were he is until the ambulance arrives. *Id @ 19.05.52.*

26. Petitioner then realizes that he is bleeding from his right ear. *Id @ 19.06.39.*  Respondent Rector then tells the Petitioner, "You can't put your hands on a cop.  Or push or what you did

to me.  Do you remember that?" *Id @ 19.06.44.*  The Petitioner responds by nodding and stating that he does not remember doing what Respondent Rector stated the Petitioner did. Though, it is still clear that he is disoriented.

27. Petitioner again shows Respondent Rector that he is bleeding from his right ear.  Then on his own fruition, the Petitioner rolls on to his stomach where it is obvious that the Petitioner has been bleeding consistently from his right ear. *Id @ 19.07.33.*  Then the Petitioner begins to sob and Respondent Rector offers the Petitioner water, instructs the Petitioner to sit up, and the Petitioner asks Respondent Rector to pour the water over his head.

28. Respondent Rector lectures the Petitioner stating that the Petitioner was acting like he was "charging" him, that it appeared that the Petitioner wanted to fight him, and that the officers do not know the intentions of a suspect, and not to do that.  Then asking if the Petitioner understands. *Id @ 19.09.25*

29. The Petitioner then moves to "all-fours" and begins to sob, asking for more water on the back of his neck, and continues to sob.  It appears that the Petitioner momentarily loses consciousness then comes to.

30. From the time that the Petitioner is body slammed, face first into the concrete sidewalk, by Respondent Rector, and when the ambulance arrives, as indicated by Respondent Rector approximately thirteen (13) minutes had passed.  *Id @ 19.14.14.*

31. When three Emergency Medical Technicians (EMT) approach, Respondent Rector tells them that the Petitioner is "bleeding from face and his ear when he got slammed on the ground and hit his head right there on the sidewalk". *Id @ 19.14.44.*  All the while the Petitioner is crying.  One of the EMT's asks what happened and Respondent Rector states that the Petitioner "tried to fight me." *Id @ 19.15.01.*

32. One of the EMT's asks the Petitioner if she can touch him to examine his back and asks if he is experiencing pain in his back.

33. Meanwhile, Respondent Rector responds to the one male EMT when the EMT asks what happened and the Respondent exclaims that "he just charged at me", then "he kinda charged at me". *Id @ 19.16.00.*

34. Respondent shares his observation about the Petitioner with the EMT's, that the Petitioner "spaces out and then comes to" *Id @ 19.16.54.*  Respondent Rector tries to get the Petitioner to sit up but, the Petitioner is not very responsive and still on "all-fours".

35. The EMT's assist the Petitioner on to a stretcher *Id @ 19.19.19.*  The EMT's wait for Respondent Surratt to take phots of the Petitioner while he lays on the stretcher, waiting to be loaded on to the ambulance. (Attachment 3 – *Photographs of Petitioner's Injuries on the Scene*)

36. As the Petitioner is being loaded into the ambulance, one of the EMT's asks if the Petitioner has a phone.  Respondent Surratt then retrieves the Petitioner's cell phone from the general contractor, who had earlier snatched the Petitioner's cell phone from him and gives the cell phone to one of the two female EMT's. *Id @ 19.20.07.*

37. The bodycam ends ten (10) minutes after the ambulance arrives and is presumed to have departed for the emergency room minutes thereafter.  The Petitioner was taken to UTMB Health.

38. At least twenty-three (23) minutes passed from the time that emergency services were called until the ambulance pulls away from the scene.

39. The Petitioner ultimately suffered a *stroke*, among other injuries, as a result of the violent and brutal body-slam suffered at the hands of Respondent Rector.

40. The Petitioner continues to suffer catastrophic and life-altering injuries that occurred during a Respondents' (Rector and Surrant) detention.

41. The Petitioner's resulting medical history, as diagnosed, discovered, and reported in the Petitioner's Life Plan[2] are as follows:

- Intractable headache
- Unspecified chronicity pattern
- Contusion of left temporal lobe
- Hemiparesis of right side of face
- Hemiparesis of right dominant side
- Hemiplegia, unspecified affecting right-side dominant
- Anesthesia of skin
- Other specified anxiety disorders
- Right sided numbness
- Depression with anxiety
- Psychotic depression
- Diffuse traumatic brain injury with loss of consciousness of unspecified duration
- Schizophrenia, unspecified

---

[2] Petitioner's Life Plan to be filed with the Court under seal due to the very sensitive and private information contained therein.

- Mental Health Problem
- Brain Injury
- Catatonic State
- Confusion
- Contusion of face
- Hematoma of right parietal scalp
- Abrasions of multiple sites

## VI.   42 USC §1983 — NO QUALIFIED IMMUNITY

42. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

43. The following Respondents have *No Qualified Immunity*: City of League City, Texas, the City of League City Police Department, Officer Trevor Rector and Officer Tanner Surrat each and all in their Official Capacities and their Individual Capacities.

44. "In analyzing whether an individual defendant is entitled to Qualified Immunity, the court considers whether the plaintiff has alleged any violation of a clearly established right, and, if so, whether the individual defendant's conduct was objectively reasonable. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *Duckett v. City of Cedar Park*, 950 F.2d 272, 276-80 (5th Cir. 1992).  In so doing, the court should not assume that plaintiff has stated a claim, i.e., asserted a violation of a constitutional right. *Siegert*, 500 U.S. at 232. Rather, the court must be sure that, if the facts alleged by plaintiff are true, a violation has clearly occurred. *Connelly v. Comptroller*, 876 F.2d 1209, 1212 (5th Cir. 1989).  Even if defendants are alleged to have acted in unison, the court must address the actions of each individually to determine whether Qualified Immunity applies. *Cass v. City of Abilene*, 814 F.3d 721, 730-31 (5th Cir. 2016); *Meadours v. Ermel*, 483 F.3d 417, 421-22 (5th Cir. 2007); *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999).  The Supreme Court explained long ago that "[t]he Qualified Immunity standard gives ample room for mistaken judgments by *protecting all but the plainly incompetent or those who knowingly violate the law* [emphasis added]." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)). And "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley*, 475 U.S. at 341.  Further, that the officer himself may have created the situation does not change the analysis.  That he could have handled the situation better does not affect his entitlement to Qualified Immunity. *Young v. City of*

*Killeen*, 775 F.2d 1349, 1352-53 (5th Cir. 1985).  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and modifications omitted).  "There are two ways to demonstrate clearly established law." *Batyukova v. Doege*, 994 F.3d 717, 726 (5th Cir. 2021). In the typical case, the plaintiff  "identif[ies] a case or body of relevant case law in which an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Id.* (quotation marks and citations omitted). This approach "*do[es] not require a case directly on point*," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S.731, 741 (2011)."  *Roberts v. McNew*, No. 5:21-CV-00170-11, 2023 U.S. Dist. at *5-7 (N.D. Tex. 2023)

45. The Petitioner will show that a) his Constitutional rights were violated, and that b) those rights were clearly established at the time of the alleged conduct.  These two prongs fall in line with *Saucier v. Katz*, 533 U.S. 194 (2001), in which the Supreme Court established a two-part test for determining whether or not qualified immunity applies: a) do the facts indicate that a constitutional right has been violated, and b) was that right clearly established at the time of the alleged conduct.  When such a right(s) has been violated, qualified immunity does not apply.  *Id*.

## CAUSES OF ACTION

## VII.   42 USC §1983 — CITY OF LEAGUE CITY'S AND LEAGUE CITY POLICE DEPARTMENT'S LIABILITY UNDER *MONELL*

46. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

47. Respondents are liable to Petitioner because Petitioner's constitutional rights were violated due to the City of League City and League City Police Department's official policies, unofficial customs, patterns of practice, and conscious indifference to Petitioner's rights. Furthermore, policymakers within City of League City and League City Police Department ratified the actions of Respondents that form the basis of Petitioner's §1983 claim against Respondents.

48. In order to hold a municipality such as the City of League City liable under §1983, a Petitioner must demonstrate that the constitutional deprivation was the product of a policy or custom of the local governmental unit. *See, e. g., Pembaur v. Cincinnati*, 475 U.S. 469 (1986).  The Petitioner must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. *See Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

49. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  A policy of inaction may also be a municipal policy within the meaning of *Monell. See, e.g., Long v. County of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006).  A choice among alternatives by a municipal official with final decision-making authority may serve as the basis of municipal liability. *See Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986).  Ratification of the decisions of a subordinate by an official with final decision-making authority can also be a policy for purposes of municipal liability under §1983.  *See City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988).

50. The following official policies, unofficial customs, persistent practices, and official ratifications have been promulgated within the within City of League City and League City Police Department:

      i. League City Police Department, General Order, Authorization to Use Force, Reference Number: 601 [3]


## VIII.   42 USC §1983 — EXCESSIVE FORCE

51. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

52. Petitioner sues Respondent Rector, a responding LCPD Officer, for the unlawful use of excessive force under 42 U.S.C. §1983.  Petitioner will show that his a) Constitutional rights

---

[3] Reference Number: 601, General Order, League City Police Department, Authorization to Use Force, https://www.leaguecitytx.gov/DocumentCenter/View/24399/Use-of-Force-Policy  (last updated June 22, 2020)

were violated, and b) that the violation of his Constitutional rights was caused by a person acting under the color of law.

53. Petitioner sues Respondent Surrat, a responding LCPD Officer, ratified the unlawful use of Excessive Force against the Petitioner when he did not intervene and stood by idly while his responding partner, Respondent Rector, conducted his unlawful detention and excessive use of force upon the Petitioner.

54. To prevail in a claim under §1983, *West v. Atkins*, 487 U.S. 4242 (1988) establishes that a Petitioner must prove a) that his constitutional rights were violated, and b) that the violation was caused by a person acting under color of law.

    a. Petitioner can prove by a preponderance of the evidence that Respondent(s) used *Excessive Force*.

        i. For a Petitioner to prevail on a claim of *Excessive Force* under the 4th Amendment, the Petitioner must show:

> "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive to the need, and (3) the force used was objectively unreasonable." *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016).

> "The test used to determine whether a use of force was reasonable under the Fourth Amendment is not capable of precise definition or mechanical application." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (internal quotation marks omitted).

> "Rather, its proper application requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance.  However, officers must assess not only the need for force, but also the relationship between

the need and the amount of force used." *Id. Burke v. Lopinto*, No. 21-1588, 2023 U.S. Dist. (E.D. La. 2023).

**Respondent Rector and Respondent Surrat Violated the Petitioner's 4th Amendment Rights – Excessive Force**

1. Respondent Rector body-slammed the Petitioner forehead first, onto the cement sidewalk, when the Petitioner was in a submissive position – his back turned and his hands behind his back.  As a result of Respondent Trevion body-slamming the Petitioner forehead first, onto the cement sidewalk, the Petitioner (1) *suffered a* stroke – catastrophic, traumatic brain *injury* – in which the Petitioner now has permanent effects which affect every aspect of his life, including his ability to work at full-capacity, provide for his family, and have normal familial relationships.

2. Further, it is highly likely that the Petitioner's injuries were exasperated when Respondent Rector and Respondent Surratt continually moved the Petitioner's body around.  It was clear that the Petitioner had a serious head injury and potential a neck or spine injury because the Petitioner was convulsing immediately upon the impact of his forehead hitting the pavement, bleeding from his right ear, losing consciousness, and he was not entirely coherent through the entire duration. "If you suspect a back or neck (spinal) injury, **do not move the affected person.** Permanent paralysis and other serious complications can result. Assume a person has a spinal injury if:

   - There's evidence of a head injury with an ongoing change in the person's level of consciousness;
   - The person complains of severe pain in his or her neck or back;
   - An injury has exerted substantial force on the back or head;
   - The person complains of weakness, numbness, or paralysis or lacks control of his or her limbs, bladder or bowels;
   - The neck or body is twisted or positioned oddly." [4]

---

[4] Spinal Injury: First Aid Print, https://www.mayoclinic.org/first-aid/first-aid-spinal-injury/basics/art-20056677 (Feb. 2, 2023)

3. This injury and its resulting effects and affects would not have occurred but for Respondent Rector (2) *directly and only using the force,* beyond the scope of the need, which was clearly excessive, and (3) *the force used* by Respondent Rector *was objectively unreasonable*. [italicized emphasis added] Test provided by *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016)

4. Respondent Surrat stood by idlily and did not intervene in ad his responding officer partner, Respondent Rector, in deescalating the situation in which, the Petitioner being in a submission position, could have been subdued without the extreme, brutal, and injurious excessive force.

b. Petitioner can prove by a preponderance of the evidence that the Respondent Rector and Respondent Surrat acted intentionally.

i. A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

**Respondent Rector and Respondent Surrat Violated the Petitioner's 4ᵗʰ Amendment Rights – Intentional Act**

1. Respondent Rector and Respondent Surrat acted intentionally when they violated the Petitioner's 4ᵗʰ Amendment Right fro unreasonable seizure and detention that went beyond the scope necessary and proper, utilizing excessive force.  *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016) (officers utilizing excessive force that was objectionably unreasonable).

## IX.  <u>VIOLATION OF PETITIONER'S 4ᵀᴴ AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION</u>

55. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

56. Petitioner's 4th Amendment right of not to be subjected to excessive force was violated by Respondent Rector and Respondent Surrat on May 13th, 2022.

57. Both Respondent Rector's and Respondent Surrat's seizure by use of extreme excessive force by body-slamming the Petitioner forehead first, onto the cement sidewalk, while the Petitioner was in a submissive position with his back turned and hands behind his back went beyond the scope that was necessary and proper to effectuate a proper seizure of the person and was violative of the Petitioner's 4th Amendment right to not be subjected to such actions.

    a. Petitioner can prove by a preponderance of the evidence that Respondent Rector and Respondent Surrat used *Excessive Force* as prohibited by the 4th Amendment of the United States Constitution.

        i. For a Petitioner to prevail on a claim of *Excessive Force* under the 4th Amendment, the Petitioner must show:

            "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive to the need, and (3) the force used was objectively unreasonable." *Orr v. Copeland*, 844 F.3d 484, 492 (5th Cir. 2016).

            "The test used to determine whether a use of force was reasonable under the Fourth Amendment is not capable of precise definition or mechanical application." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (internal quotation marks omitted).

            "Rather, its proper application requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Officers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance. However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Id. Burke v. Lopinto*, No. 21-1588, 2023 U.S. Dist. (E.D. La. 2023).

# X.  VIOLATION OF PETITIONER'S 8TH AMENDMENT RIGHTS UNDER THE UNITED STATES CONSTITUTION

58. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

59. Respondent the City of League City Police Department (LCPD) violated Petitioner's 8th Amendment rights guaranteed by the 5th and 14th Amendments of the Constitution were violated.

   a. Petitioner's 8th Amendment right to not be subjected to "cruel and unusual punishment" by Respondents.  An 8th Amendment claim regarding conditions of confinement must meet the following requirements:

      i. The confinement conditions must have caused an "objectively, sufficiently serious" deprivation;

      ii. Officials, such as jailers/police officers, must have acted with "deliberate indifference" to the plaintiff's health or safety;

      iii. The Officials must be subjectively aware of the facts from which they have caused serious deprivation.

      *Williams v. Peykos*, No. 6:20cv566, 2023 U.S. Dist. (E.D. Tex. 2023)

**Respondent the LCPD Violated Petitioner's 8th Amendment Rights**

   1. The Petitioner was subjected to and suffered significant cruel and unusual punishment, resulting traumatic, catastrophic, and permanent life-altering injuries – all resulting from the extreme excessive force in which the LCPD condoned its use, specifically by Respondent Rector.

   2. It is certain that Respondent Rector and Respondent Surrant "acted with 'deliberate indifference' to the plaintiff's health or safety, which means that the official knows that the inmate [detainee] faces a "substantial risk of serious harm" but "disregards that risk by failing to take reasonable measures to abate it." *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811

(1994)).  Here, neither Respondent, upon realizing that the Petitioner was seriously injured, took due care to assure that he was immobilized to protect potential further injury because of the serious head trauma.  The resulting injury to the Petitioner is now a permanent affliction from which he will never recover.

3. The Respondents were aware of the fact that the Petitioner was in need of medical attention, because they became aware that the Petitioner's convulsions were not an "act" and they themselves., called 911.   Therefore, they could draw an inference that the Petitioner was, in fact, in need of medical attention.  "The official must be subjectively aware of the facts from which the inference could be drawn and must actually draw the inference. *Id.* "'Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm.'" *Torres*, 972 F.3d at 663 (quoting *Williams v. Banks*, 956 F.3d 808, 811 (5th Cir. 2020)); *see Hinojosa v. Livingston*, 807 F.3d 657, 665 (5th Cir. 2015).

## XI.  VIOLATION OF PETITIONER'S DUE PROCESS RIGHTS UNDER THE UNITED STATES CONSTITUTION

60. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

61. Petitioner's Due Process Rights:

   a. The Petitioner's substantive Due Process Rights were violated pursuant 42 U.S.C. 1983, while acting under the color of law, by violating the Petitioner's right to bodily integrity without being seriously injured by the use of extreme excess force, by being body-slammed, forehead first, onto the cement sidewalk, thereby resulting in traumatic, catastrophic, and permanent life-altering injuries. **Respondent Rector and Respondent Surrat Violated Petitioner's Due Process Rights**

1. Here, Petitioner's substantive Due Process Rights were violated when Respondent Rector, while attempting to seize the Petitioner, (operating under the color of law) violated his right to bodily integrity by body-slamming, forehead first onto the cement sidewalk.   Respondent Surrat, while in close proximity and able to assist in de-escalation and seizing the Petitioner, stood idlily by and allowed Respondent Rector to utilize extreme, excessive force against the Petitioner while he was in a submissive position.

2. Further it is noteworthy to assert "that delayed medical treatment in violation of the Fourth and Fourteenth Amendments survived summary judgment because a jury could find a reasonable officer would have concluded the detainee was making involuntary movements resulting from epileptic seizures [here, in this instance, the Petitioner was having convulsions] and was not actively resisting the officers when they tased the detainee multiple times [here, in this instance, when the Petitioner was handcuffed] [Additionally],  [2]-Qualified immunity did not protect the officers because case law clearly established that the continued use of force, particularly tasing, [here, body-slamming a detainee forehead first, onto the cement sidewalk] against a restrained and subdued person who was experiencing a medical emergency and not actively resisting was unconstitutional; moreover, fact issues existed as to whether the officers improperly delayed emergency medical treatment and were deliberately indifferent. *Austin v. City of Pasadena*, 74 F.4th 312, 319 (5th Cir. 2023).

3. Delayed emergency care for the Petitioner was also an issue which was violative of the Petitioner's Due Process Rights.  At least twenty-three (23) minutes passed from the time that emergency services were called until the ambulance pulls away from the scene.  This does not consider the time that it took for the ambulance to reach the emergence care facility.  The Petitioner

was bleeding from his right ear and it was clear that he sustained a serious and traumatic brain/head injury.  Ultimately, he suffered a stroke which is a catastrophic and permanent injury.

## XII.   NEGLIGENCE PER SE

62. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

63. In addition to all other claims and assertions, all Respondents are violative of _League City Police Department, General Order, Authorization to Use Force, Reference Number: 601_. Under this General Order, Excessive force is defined and assessed using the following definition (_601.02 Definitions_):

- "Force is excessive when its application is unreasonable and unnecessary under the circumstances, resulting in any injury, serious bodily injury or death to an actor. Based on an objective reasonableness standard employed by the courts, the following considerations contribute to a determination of excessive force:

  1.   The severity of the crime;
  2.   The nature and extent of the threat posed by the suspect;
  3.   The degree to which the suspect resists arrest or detention; and
  4.   Any attempts by the suspect to evade arrest by flight.

64. Here, the force used by Respondent Rector was excessive and beyond the guidelines specified in the LCPD's own _General Order_.  The Petitioner's (1) "crime" was not severe; (2) the Petitioner was in a submissive position with his back to the Respondent, with his hands behind his back and therefore, did not pose a threat; (3) the Petitioner did not resist; and (4) the Petitioner did not attempt to evade arrest.

65. Here, the Respondent Rector and Respondent Surrat breached the duty set forth in the LCPD's _General Order_ when they endorsed and utilized extreme excessive force in a manner that does not comport with the LCPD's _General Order_.

66. The breach of the Respondents' duties under LCPD's _General Order_ is the proximate cause of the Petitioner's damages because but for the Respondents' breach the Petitioner would not have suffered permanent life-altering injuries at the hands of h=the Respondents.  This breach is also the actual cause of the Petitioner's damages because had the Respondents not

utilized such extreme excessive force, the Petitioner would not have suffered permanent life-altering injuries.

67. The Petitioner's liquidated damages include, but are not limited to extreme medical bills, lost wages, the necessity for continuing medical care, all associated fees and costs of this Federal Lawsuit, such as attorney's fees, court costs and expenses.  The Petitioner's unliquidated damages include, but are not limited to, violation of the Petitioner's U.S. Constitutional Rights, the Petitioner's inability to have resolve without the intervention of a Federal Lawsuit (this Complaint), mental anguish, a period of loss of marital consortium, the inability to participate in parenting in a normal capacity to his three children, and impact of the Petitioner's permanent physical and mental health conditions.

## XIII.   NEGLIGENT SUPERVISION

68. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

69. Respondent LCPD and the Respondent City of League City were in supervisory positions during the multiple offenses perpetrated upon Petitioner, negligently supervising their subordinates, Respondent Rector and Respondent Surrat.

70. An employer, here Respondent LCPD and the Respondent City of League City, are liable for the negligent hiring and supervision of employees – specifically, Respondent Rector and Respondent Surrat.

71. Respondent LCPD and the Respondent City of League City failed to hire, supervise, or train their subordinates what was a direct cause of harm to a Petitioner, and it was foreseeable that such harm could result without the necessary training, education, and supervision.  A supervisor can only expect what they inspect.

## XIV.   DAMAGES

72. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

73. As a result of Respondents statutory and constitutional violations, Petitioner has suffered catastrophic, traumatic, permanent, and life-altering damages and injuries.

## XV.  ATTORNEY'S FEES AND COSTS

74. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

75. Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, Petitioner asserts right to an award of attorney's fees and costs under its 42 U.S.C. § 1983 pleadings if he prevails.

## XVI.  RELIEF REQUESTED

76. Petitioner hereby adopts, incorporates, restates, and re-alleges all previous paragraphs, inclusive, with regard to all facts, claims, allegations, and causes of actions.

77. Petitioner seeks the reasonable and necessary attorney's fees incurred in connection with this claim under *Tex. Civ. Prac. & Rem. Code Section 38.001*.

78. Under Texas law, to recover attorney's fees, the Petitioner must prove that the attorney's fees were reasonable and necessary for the prosecution of the case. *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818–19 (Tex.1997). A Petitioner must ask the fact-finder to award a specific dollar amount, not merely an amount as a percentage of judgment. Id. at 819. Texas courts, like the Fifth Circuit, generally use the lodestar method for calculating reasonable attorney's fees. See *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc*., 180 S.W.3d 761, 782–83 (Tex.App.-Fort Worth 2005, pet. granted, judgm't vacated w.r.m.); see also *Guity v. C. C.I. Enters., Co.*, 54 S.W.3d 526, 528 (Tex.App.-[1st Dist.] 2001, no pet.) (stating that in determining the reasonableness of attorney's fees, the fact finder must be guided by a specific standard, and that this standard is substantially the same under Texas and federal law); *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.1995) (applying lodestar method with respect to attorney's fees in connection with federal claims). However, under Texas law, strict reliance on the lodestar method of calculation is not required if the Petitioner can otherwise demonstrate that the fees sought are reasonable. See e.g., *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 240–41 (Tex.App.-San Antonio 2001, pet. denied).  "The first step under the lodestar method is to determine the "lodestar" amount by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers. *See La. Power & Light Co.,* 50 F.3d at 324.  In the second step of the lodestar method, a

court considers whether the lodestar figure should be adjusted upward or downward depending on its analysis of additional factors. *Id.* The Texas Supreme Court has identified eight factors to be used by the fact-finder to determine the reasonableness of the fees[5]. *Arthur Anderson & Co*., 945 S.W.2d at 818. If these factors are accounted for in determining the lodestar amount, they should not be considered when making adjustments. *Guity*, 54 S.W.3d at 529.

79. For these reasons, Petitioner prays for judgment against Respondents, any or all of them, for following:

    a.  Actual damages;

    b.  Pre-judgment and post-judgment interest;

    c.  Punitive and exemplary damages against Respondent in an amount to be determined and as allowed by the Court. *See Smith v. Wade*, 461 U.S. 30 (1983);

    d.  Attorneys' fees;

    e.  Costs of Court; and

    f.  Such other and further relief as the Court deems just and equitable including appropriate.

## I.   JURY DEMAND

80. Petitioner respectfully demands trial by jury and has tendered the appropriate fee for the same.

81. **WHEREFORE**, Petitioner respectfully requests Respondent be cited to appear and answer herein, and that upon final trial hereof, the Court award the relief against Respondent.

82. Petitioner further respectfully request that he be afforded all due expediency within the discretion of this Honorable Court to facilitate the preservation of evidence, to demonstrate

---

[5] These factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing their services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *Arthur Anderson & Co., 945 S.W.2d at 818.*

that such unconscionable conduct will not be tolerated in a civilized society, and to ensure that justice may be served.

Respectfully Submitted,

*/s/Courtney A. Vincent*
**Courtney A. Vincent**
Minnesota Bar No. 0403083
Admitted:
**Federal Western District of Texas**
info@vincentlawpllc.com
VINCENT LAW, PLLC
1035 Dairy Ashford, Suite 145
Houston, Texas  77079
**Mailing Address:**
P.O. Box 940129
Houston, Texas  77094
Tel: (713) 223-9300
Fax: (832)603-4444
**COUNSEL FOR PETITIONER**